[Cite as *Young v. Lamm*, 2019-Ohio-3945.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TARL YOUNG | JUDGES:<br>Hon. William B. Hoffman, P.J |
| Plaintiff-Appellee | Hon. John W. Wise, J.<br>Hon. Craig R. Baldwin, J. |
| -vs- | Case No. 2018CA00168 |
| MEGAN LAMM | |
| Defendant-Appellant | O P I N IO N |

CHARACTER OF PROCEEDINGS:     Appeal from the Stark County Court of
Common Pleas, Juvenile Division, Case
No. 2015JCV00112

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     September 26, 2019

APPEARANCES:

For Plaintiff-Appellee     For Defendant-Appellant

CHRISTOPHER COLERIDGE     SUSAN J. LAX, RN, MS, LLC
Coleridge Law Office, LLC     755 White Pond Drive, Ste. #403
101 Central Plaza South     Akron, Ohio  44320
500 Chase Tower
Canton, Ohio  44702

*Hoffman, P.J.*

**{¶1}** Defendant-appellant Megan Lamm ("Mother") appeals the October 22, 2018 Judgment Entry entered by the Stark County Court of Common Pleas, Juvenile Division, which named plaintiff-appellee Tarl Young ("Father") as the residential parent and legal custodian of the parties' minor child ("the Child").

STATEMENT OF THE FACTS AND CASE

**{¶2}** Mother and Father are the biological parents of the Child. Mother has two minor daughters from her marriage to her ex-husband Michael Lamm. Mother and Father have never been married. Paternity was established in April, 2014. Father filed a petition to establish visitation on February 4, 2015. The parties filed an Agreed Judgment Entry relative to visitation on October 21, 2015. Therein, the parties agreed Mother would be the residential parent and legal custodian of the Child and Father would enjoy visitation pursuant to Stark County Schedule A parenting time.

**{¶3}** Bonnie and Dennis Ladley ("Grandmother" and "Grandfather", individually; "Grandparents", collectively), the Child's maternal grandparents, filed a motion for grandparent companionship/visitation on December 12, 2017. Grandparents filed a motion to intervene on February 23, 2018, which the trial court granted on March 7, 2018. On May 8, 2018, Father filed a motion for reallocation of parental rights, seeking custody of the Child. The following day, May 9, 2018, Father filed an ex parte motion for temporary custody. Following a hearing, the magistrate denied, Father's ex parte motion.

**{¶4}** Father filed a motion to set aside the magistrate's order on May 22, 2018. The trial court scheduled the motion for hearing on July 10, 2018. The trial court granted Father's motion to set aside, and ordered the Child be placed in the temporary custody of Father.

**{¶5}** The trial court conducted a hearing on Father's motion for reallocation of parental rights on September 10, 11, and 28, 2018. The following evidence was adduced at the hearing.

**{¶6}** Christine Dandrow with the Stark County Community Action Agency testified she is a lead teacher in the Head Start Program at the William Malloy Center in Massillon, Ohio. Dandrow stated the Child was enrolled in the full day program during the 2017-2018 school year. As part of the program, Dandrow conducted two home visits and held two parent teacher conferences each year. Dandrow had daily contact with Mother during drop-off and pick-up times. She had contact with Father during his occasional drop-offs or pick-ups.

**{¶7}** Mother completed all of the paperwork and evaluations for the Child's admission to the Head Start Program. Dandrow recalled Mother noted the Child had a number of problems which she felt needed to be addressed, including speech delays, cognitive and emotional delays, social anxiety, separation issues, and possibly autism. A speech screening revealed no delays and the Child actually "passed with flying colors." Trial Tr. Vol. I at 61. Dandrow and other school personnel observed the Child and did not detect any of the issues about which Mother was concerned. The Child did experience normal separation issues during the first week of school, but soon settled into the daily routine. Dandrow never witnessed any concerns with the Child which would have warranted a referral to a doctor or therapist.

**{¶8}** Sometime between October and December, 2017, Mother provided Dandrow with paperwork to complete for a doctor. Mother requested the paperwork be returned to her, but Dandrow explained the school's policy was to mail completed

documents to the requesting physician. Mother never provided Dandrow with the name and address of the doctor.

{¶9} Dandrow testified Mother was sometimes very emotional and appeared overwhelmed. Mother failed to ensure the Child's homework was completed. Homework generally consisted of a letter bag which required the Child to bring in an object starting with the letter of the week. Dandrow gave up and simply helped the Child do his homework at school. The Child's homework was completed when he was with Father.

{¶10} Dandrow noticed changes in the Child's behavior starting in April or May, 2018. The Child went from being a typical active and social boy to a child who was agitated, did not interact with his peers, could not sleep at naptime, was paranoid, and had a short attention span. Dandrow also observed dramatic changes in the Child's demeanor. When Dandrow asked Mother if the Child was on medication, Mother declined to answer.

{¶11} On cross-examination, Dandrow indicated she had no issues with Grandmother, whom Mother had placed on the authorized drop-off/pick-up list. Dandrow recalled Mother removed Grandmother from the list at some point. Dandrow expressed her concern to Mother the Child was too young to be on medication. Father registered the Child for the program for the 2018-2019 school year. During the summer of 2018, Mother requested the staff complete a social security disability form for the Child. Dandrow completed the form, but was unaware Father had custody of the Child at that time.

{¶12} On re-direct, Dandrow recalled an incident which occurred in April, 2018. The Child revealed he was hurt by Mother. At the time, Dandrow did not know what had

occurred, but the Child "was very, very upset." *Id.* at 91. Dandrow contacted the Guardian ad Litem. The Child disclosed to Dandrow his concerns he would not be able to see Father or Grandparents again because Father had "broke Mommy's heart by not staying with [them]." *Id.* at 92. The Child thought Mother's heart was literally broken and was distraught. On another occasion in April or May, 2018, the Child told Dandrow Father was going to steal him and was not a good person. The Child became paranoid and would not go outside.

{¶13} Attorney Nikki Reed, the Guardian ad Litem, filed her initial report on March 1, 2018, an interim report on April 19, 2018, and a second interim report on June 7, 2018. In all three reports, Attorney Reed expressed concerns about the Child remaining in Mother's home. In her final report, Attorney Reed recommended Father be named as residential parent and Mother be provided with Schedule A parenting time.

{¶14} Through her investigation, Attorney Reed discovered Mother had reported the Child as having developmental delays, speech and language delays, oppositional defiant disorder, autism, and headaches, which were contrary to the observations of the Child's Head Start teacher. The pediatric neurologist did not find any neurological issues which would cause the Child to experience headaches, and did not prescribe any medication. The physician referred Mother and the Child to a local agency for counseling, and suggested Mother attend the Triple P Program at Akron Children's Hospital, a parenting education course to assist parents with more difficult children. Mother did not attend the Triple P Program, but did take the Child to counseling. Based upon Mother's own reporting, the nurse practitioner at the counseling facility diagnosed the Child with autism spectrum disorder and oppositional defiant disorder, and prescribed Lexapro 5mg

for the Child. Mother subsequently contacted the nurse practitioner, stating the medication was not working. The nurse practitioner prescribed Risperdal and Guanfacine HCL.

{¶15} The trial court issued interim orders on July 11, 2018, ordering Father to take the Child to Akron Children's Hospital for a psychiatric evaluation. The hospital would not conduct the evaluation due to the Child's young age. Father did, however, have the Child evaluated at Child and Adolescence Services. Father was instructed on how to wean the Child off of the medication.

{¶16} Attorney Reed contacted Dr. Patty Millsaps-Linger, Mother's counselor, who noted Mother was frequently in a crisis state, overwhelmed, and stressed. Mother was inconsistent with her counseling. She would attend multiple appointments then not attend for a considerable period of time, sometimes months. Mother presented the Child to Dr. Millsaps-Linger to address his behaviors. In the fall of 2017, Dr. Millsaps-Linger suggested Mother send the Child and her daughters to stay with a trusted adult for a few weeks to help Mother get back on track. Mother chose to send the Child and her daughters to Grandmother's home. However, Mother ultimately only sent one of her daughters, making the girl feel as if she had been "kicked out" of Mother's home and did not know if she was ever going home.

{¶17} Attorney Reed expressed concerns about Mother bringing men into the Child's and her daughters' lives. She noted Mother often made decisions which were not in the Child's and her daughters' best interest. On the other hand, Attorney Reed had no concerns with Father's ability to parent or his decision making. After being awarded temporary custody of the Child, Father sought professional help for the Child and weaned

him off of the medication previously prescribed. Attorney Reed acknowledged Father had failed to take the Child to doctor's appointments and did not attend appointments, but believed such occurred because he was unaware of said appointments until after the fact. Father has a good relationship with Grandparents and will facilitate visitation between them and the Child.

{¶18} Father testified he has three daughters from a prior marriage. Two of his daughters and one granddaughter reside with him. He has a good relationship with his ex-wife. Father acknowledged he was in arrears with his child support for the Child, but explained he had had heart surgery and was unable to work. Father is currently employed and pays on the arrearage in addition to his monthly child support obligation. Father admitted he and Mother cannot communicate which is mainly the result of the wild accusations Mother made about Father and the fact Mother wanted the child to be on medication. According to Father, Mother accused him of murdering two people, claimed he was in the witness protection program, alleged he caused a motorcycle accident which killed a friend, and insisted people "die" around Father. Father stated he did not trust Mother and wished to communicate only through Our Family Wizard.

{¶19} Father expressed concerns over the Child's education, but noted he had limited contact with the Head Start Program due to his visitation schedule. When Father learned the Child was months behind in his schoolwork, he helped the Child catch up. Father believed it was in the Child's best interest to see Grandparents. Father worried Mother would hurt the Child by severing his relationship with Grandparents. Father was disturbed Mother placed the Child on medication.

{¶20} Father testified Akron Children's Hospital would not conduct a medication evaluation due to the Child's young age. Phoenix Rising would not communicate with Father. Father finally had the Child evaluated through Child and Adolescent Services. The therapist observed no signs of autism or any disorders, and found no need for the Child to be on medication. The therapist recommended therapy and provided Father with a plan to wean the Child off of the medication he was taking. Father testified, while the Child was on the medication, the Child was unable to sleep at night, but would fall asleep during the day, would not eat, cried excessively, and was not his normal self. After the Child was weaned off of the medication, he returned to his normal self, happy, ornery, and rambunctious. The Child ate and slept well.

{¶21} Dr. Patty Millsaps-Linger testified she did not give a diagnosis for the Child and never told Mother the Child needed to be on medication. Dr. Millsaps-Linger did not evaluate the Child and did not provide any services to the Child. Based upon the information about the Child Mother provided to her and her personal observations of the Child when he was in her office, Dr. Millsaps-Linger advised Mother to have the Child undergo an assessment. Dr. Millsaps-Linger diagnosed Mother with Adjustment Disorder with Mixed Anxiety and Depression, sustained for a period of more than six months. Mother has ongoing challenges with the Child and her daughters.

{¶22} Four of Mother's friends testified on her behalf. One of the witnesses had only known Mother for two months and the trial court found her testimony provided no benefit to the court. Three of the four witnesses stated their beliefs Mother was a good parent and used appropriate discipline. None of the witnesses knew Father. All of the witnesses had limited, if any, contact with the Child.

**{¶23}** Mother testified on her own behalf. Mother stated she was in good physical health and had no mental health issues except for anxiety. She saw Dr. Millsaps-Linger on a regular basis. Mother recalled her childhood, which she described as abusive. Mother indicated she never felt loved or wanted as a child. Mother felt it was in the Child's best interest never to see Grandparents. Mother stated her belief she should be the Child's custodial parent because Father had mental health issues, was a liar, and had women in and out of his life. Mother claimed the Child's behavior changed when he visited Father. The Child called her names, told her to "shut up", and tried to choke her.

**{¶24}** Mother described the Child as "super aggressive" and having a big imagination. According to Mother, the Child threw a fit if he is told "No". Mother denied ever telling the Child Father would steal him. Mother admitted one time, while the Child was in the bathtub, she became angry and spanked him, leaving a bruise.

**{¶25}** Mother asserted Father never attended the Child's doctors' appointments, but conceded she failed to tell Father about the appointments. Mother took the Child to a pediatric neurologist at Akron Children's Hospital because of his behavioral issues. The neurologist recommended therapeutic counseling for Mother and the Child and attendance by Mother at Akron Children's Hospital Triple P Program. Mother did not attend the Triple P Program despite she herself having suggested it to the neurologist. Mother took the Child to two appointments with a nurse practitioner at Phoenix Rising. At both appointments, Mother asked for medication for the Child. The nurse practitioner prescribed Lexapro for the Child, but his behavior became worse. At the second appointment, the Child was prescribed Risperdal, an antipsychotic. Mother stated the Child's behavior improved. The Child was four years old at the time.

**{¶26}** Mother quit her job at Target to pursue an Associate's Degree in Psychology from Stark State College. Mother stated she intended to obtain her Bachelor's Degree, Master's Degree, and PhD in Psychology. Mother explained she was unable to work full-time because she was going to school full-time. At the time of the hearing, Mother was doing an internship. She worked 20 hour/week and earned $13.30/hour.

**{¶27}** Via Judgment Entry filed October 22, 2018, the trial court granted Father's Motion for Reallocation of Parental Rights and Responsibilities. The trial court found there had been a substantial change of circumstances, the modification was in the Child's best interest, and the harm likely to be caused by a change of environment was outweighed by the advantages of the change of environment of the Child.

**{¶28}** It is from this judgment entry Mother appeals, raising as her sole assignment of error;

THE TRIAL COURT ABUSED ITS DISCRETION IN NAMING APPELLEE AS RESIDENTIAL PARENT AND LEGAL CUSTODIAN OF THE MINOR CHILD, L.L.

I.

**{¶29}** We review a trial court's decision allocating parental rights and responsibilities under an abuse of discretion standard. *Miller v. Miller,* 37 Ohio St.3d 71, 523 N.E.2d 846 (1988); *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983). Custody issues are some of the most difficult and agonizing decisions a trial judge must make; he or she must have wide latitude in considering all the evidence. *Girdlestone*

*v. Girdlestone*, 5th Dist. Stark No. 2016 CA 00019, 2016–Ohio–8073, ¶ 12, citing *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 11 (1997). Our role is to determine whether there is relevant, competent and credible evidence upon which the fact finder could base his or her judgment. *See Dinger v. Dinger,* 5th Dist. Stark No. 2001CA00039, 2001–Ohio–1386. Ultimately, parental rights and responsibilities are to be allocated based upon the paramount consideration of the best interest of the child. *Trent v. Trent,* 12th Dist. Preble No. CA 98–09–014, 1999 WL 298073.

**{¶30}** The trial court reviews a motion to reallocate parental rights and responsibilities pursuant to R.C. 3109.04(E)(1)(a), which provides:

The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree * * * unless the modification is in the best interest of the child * * *and one of the following applies:

The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.

The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.

The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.

**{¶31}** Thus, before a trial court may modify a prior allocation of parental rights and responsibilities, it must consider: (1) whether a change in circumstances occurred, (2) whether modification is in the child's best interest, and (3) whether the benefits that result from the change outweigh any harm. *Clark v. Smith*, 130 Ohio App.3d 648, 653, 720 N.E.2d 973, 976 (3rd Dist. 1998). The record must support each of these findings or the modification of child custody is contrary to law. *Flickinger, supra* at 417. Additionally, R.C. 3109.04(E)(1)(a) creates a rebuttable presumption retaining the residential parent designated by the prior decree is in the child's best interest. *Meyer v. Anderson*, 2nd Dist. Miami No. 96CA32, 1997 WL 189383, (April 18, 1997)

**{¶32}** If a change of circumstances is established, the trial court must weigh the best interest of the children before modifying a residential-parent designation. R.C. 3109.04(F), which sets forth the factors a trial court must consider in determining the best interest of the child, provides:

In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights

and responsibilities, the court shall consider all relevant factors, including, but not limited to:

(a) The wishes of the child's parents regarding the child's care;

(b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;

(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;

(d) The child's adjustment to the child's home, school, and community;

(e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child * * *;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

**{¶33}** "No one factor is dispositive." *Carr v. Carr,* 12th Dist. Warren Nos. CA2015–02–015 and CA2015–03–020, 2016–Ohio–6986, ¶ 22. Rather, the trial court has discretion to weigh any and all relevant factors as it sees fit. *Id.* The trial court also has discretion in determining which factors are relevant. *Hammond v. Harm,* 9th Dist. No. 23993, 2008–Ohio–2310, ¶ 51. The factors are merely to provide guidance for the trial court in determining what is in the child's best interest, and each factor may not necessarily carry the same weight or have the same relevance, depending upon the facts before the trial court. *Beard v. Bloomfield*, 3rd Dist. Wyandot App. No. 16–11–09, 2012 - Ohio- 2133, ¶ 29. Further, the trial court is not required to separately address each best interest factor enumerated in R.C. 3109.04. *See, In re Henthorn,* Belmont App. No. 00–BA–37, 2001–Ohio–3459.

**{¶34}** Mother does not challenge the trial court's finding a change in circumstances had occurred. Rather, Mother's arguments focus on the trial court's finding the modification was in the Child's best interest. Mother specifically asserts the trial court's conclusions as to the best interest factors were not supported by relevant, competent, and credible evidence in the record. We disagree.

**{¶35}** We have reviewed the entire record including the transcript and find the trial court did not abuse its discretion in concluding it was in the Child's best interest to name Father the residential parent and legal custodian. The Child, by all testimony, is high-energy and has an active imagination. Mother is often overwhelmed by the demands of motherhood and the pursuit of her education. Her answer was not to address the Child's behavioral issues through counseling as repeatedly recommended, but rather to find a provider willing to place the Child, who was 4 years old, on prescription medication. Father was able to control the Child without medication. Mother refused to allow Grandparents to visit the Child. The Child has a close relationship with Grandparents and told the trial court he wanted to keep seeing them. Father was willing to facilitate the relationship. Mother would not allow the Child to have any contact with Grandparents. The trial court thoroughly analyzed the factors and its findings were supported by the record.

**{¶36}** Mother's sole assignment of error is overruled.

{¶37} The judgment of the Stark County Court of Common Pleas, Juvenile Division, is affirmed.


By: Hoffman, P.J.

Wise, J.  and

Baldwin, J. concur